UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KIMBERLY MIEDEMA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-2508 |
| | § | |
| FACILITY CONCESSION SERVICES | § | |
| INC., d/b/a SPECTRUM CATERING & | § | |
| CONCESSIONS, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Pending before the Court are the Motion for Summary Judgment of Defendant Facility Concession Services, Inc. d/b/a Spectrum Catering & Concessions ("Spectrum") (Doc. No. 12), and Spectrum's supplement to its Motion for Summary Judgment (Doc. No. 19). Upon considering the motion, all responses thereto, and the applicable law, the Court finds that Defendant's motion must be granted.

**I. BACKGROUND**

**A. Procedural History**

Defendant Spectrum filed a motion for summary judgment on September 13, 2010 on no-evidence grounds. (Doc. No. 12.) Plaintiff Kimberly Miedema ("Plaintiff" or "Miedema") filed a response to which was attached an affidavit from Miedema proffering relevant facts. (Doc. No. 13, Ex. A.) Spectrum filed a reply. (Doc. No. 13.) On November 12, 2010, the Court held a hearing regarding the status of discovery in the case. The parties were given additional time to take the deposition of Miedema and for Miedema to respond to interrogatories propounded by Spectrum. Miedema was deposed on January 21, 2011. Spectrum filed a supplement to its

1

motion for summary judgment on February 28, 2011. (Doc. No. 19.) Miedema has filed a response, and Spectrum has filed a reply. (Docs. No. 20, 22.) The motion for summary judgment has been fully briefed and is ripe for disposition.

### B. Facts

Spectrum is a catering company based in Conroe, Texas. (Holmes Aff. ¶ 2.) Miedema worked at Spectrum as production manager, and later, as a senior production manager. (Miedema Dep. 37:17, 22.) In this position, Miedema oversaw event production, including hiring staff, ordering vendors, transporting items to venues, setting up the events, and completing the events. (*Id*. 36:4-6, 38:16-25.) During the time Miedema worked at Spectrum, her supervisors were Dave Smalley ("Smalley"), Spectrum's President, and his girlfriend Melanie Parker ("Parker"), Spectrum's Vice-President. (*Id.* 41:15-23.)

Eduardo Ventura ("Ventura") also worked at Spectrum as an employee in the warehouse. (*Id.* 125:25-126:1.) In October 2004, Ventura and Miedema were working at an event at a model home. (*Id.* 60:22.) Ventura rubbed Miedema's leg in a way that appeared out of the ordinary to Miedema. (58: 5-9.) Miedema went to a utility room in the model home to check inventory. (*Id.* 58:10-14.) Ventura followed her into the room, shut the door, and tried to kiss her. (*Id.* 58:14-15.) Shocked, Miedema pushed him away and left the utility room. (*Id.* 58:16-18, 62:25.) Miedema immediately went next door, to another model home event, and told a Spectrum contract employee, Caren Lowry, about what had happened. (*Id.* 58:21, 63:11-18.) After the event, Miedema told Ventura that his behavior would not be tolerated in the future. (*Id.* 58:21-25.) Miedema did not report the incident to her managers. (*Id.* 64:2-4.)

The next incident between Miedema and Ventura occurred approximately six weeks later. (*Id.* 65:17.) After working at an event late into the evening, Miedema and Ventura were

2

unloading a van in the docking bay of the Spectrum facility. (*Id.* 65:23-66:1.) Ventura kissed Miedema. (*Id.* 66:7.) Although other employees were working in the facility at the time, no one was present in the area when the kiss occurred. (*Id.* 67:22-68-24.) Miedema did not report the incident to her managers. (*Id.* 70:12.)

The next incident and first sexual encounter between Miedema and Ventura occurred later that week. (*Id.* 70:16.) Once again Miedema and Ventura were working late after finishing a large event. (*Id.* 71:3-21.) All the other employees had left. (*Id.* 71:24.) As they were cleaning and organizing linen, Ventura began to kiss Miedema. (*Id.* 72:15.) Miedema broke away and continued working. (*Id.* 73:16-17.) Ventura pushed Miedema against a sewing machine, turned off the light, and began kissing her more aggressively. (*Id.* 73:18-21.) Miedema was surprised when Ventura began to have sex with her, since it was dark and she did not know that he was preparing to do that. (*Id.* 74:8-10.) Ventura moved Miedema to the floor. (*Id.* 75:7-8.) Miedema told Ventura to stop, that she had to go home. (*Id.* 74:21-75:2.) Ventura and Miedema left the building and went to Ventura's car. (*Id.* 75:9-10.) In the car, Ventura asked Miedema if she wanted to continue. (*Id.* 75:17.) Miedema, shocked by the events and overwhelmed by the day, said that she wanted to go home. (*Id.* 76:17-23.) Miedema did not report the incident to Spectrum management or any other Spectrum employees. (*Id.* 77:3-5.) Miedema did not believe that the sex started consensually, but that she later consented to it. (*Id.* 78:1-7.)

From December 2004 to August 2006, Miedema and Ventura subsequently had sex on several occasions. (*Id*. 25:16, 26:3.) Miedema and Ventura had sex in hotels, Ventura's car, Miedema's apartment, Melanie Parker's apartment, and at a Spectrum "bunkhouse." (*Id.* 79:20-24, 82:9-11, 91:16-18.) The "bunkhouse" was a property owned by Spectrum for the overnight stay of visiting employees and as an apartment for an employee. (*Id.* 83:4-11.) The bunkhouse

3

was empty during Ventura's and Miedema's sexual encounter. (*Id.* 83:19-21.) When Ventura and Miedema had sex at Parker's apartment, Parker was not at home and did not find out about this incident. (*Id.* 92:21-93:4.)

Though Miedema did not pursue Ventura, Miedema describes Ventura as "very persistent." (*Id.* 80:19.) Miedema consented to the sexual encounters. (*Id.* 80:4, 81:10-11.) Miedema did not report any of these sexual encounters to Spectrum employees in management positions. (*Id.* 29:17-21, 85:6-7.)

The sexual relationship ended in August 2006, after which Ventura left for a trip to El Salvador. (*Id.* 96:10-16.) Miedema believes that the relationship ended for two reasons. First, Ventura had broken up with his girlfriend and had been treating Miedema poorly. (*Id.* 99:7-11.) Second, Ventura's boss, Ruben Garcia, made comments that indicated his suspicion of Ventura's and Miedema's relationship. (*Id.* 97:17-21.)

Miedema also had a sexual relationship with Robert Soboloff, a Spectrum contract employee, for approximately one month. (*Id.* 101:20-24.) Miedema told Melanie Parker about her relationship with Soboloff and that it was consensual. (*Id.* 110: 6-17.) In addition, Miedema had one sexual encounter with Walter Ventura, who is Eduardo Ventura's brother. (*Id.* 104:2-11.) Miedema did not report the sexual encounter with Walter Ventura to Spectrum management. (*Id.* 110:18-21.)

After they ceased their sexual relationship in August 2006, Ventura made approximately four unwanted sexual advances to Miedema. (Miedema Dep. 28:23-25, 122:1-2.) Miedema did not report any of these unwanted advances to Spectrum management. (*Id.* 29:13-16.)

During the course of her employment at Spectrum, several other Spectrum employees told Miedema about being sexually assaulted by warehouse employees. (Miedema Dep. 31:4-

33:2; 33:22-34:18; 181:10-21; 182:9-183:12.) These assaults included both private encounters on specific occasions and general whistling, touching, grabbing and groping in public on a daily basis. (*Id.* 174:5-8, 175:15-19.) Miedema personally witnessed at least one specific female employee being "constantly" touched by a male employee, who rubbed up against the female employee in an inappropriate manner. (*Id.* 181:10-21.) Miedema did not know whether the women who had been assaulted reported the incidents to Spectrum management. (*Id.* 33:3-6; 34:19-22; 181:22-24; 182:13-16.) In general, Miedema was unaware of any reports by a Spectrum employee to a manager that the employee had been sexually assaulted by another Spectrum employee. (*Id.* 35:2-6.) Miedema herself never complained about the inappropriate contact or conduct by male employees. (*Id.* 180:15-25.) However, Miedema states that Parker, the Vice-President, was "well aware" of the general touching of female employees by male employees since it came up in conversation between them "many times." (Miedema Dep. 186:3-10.) In addition, Miedema states that the "managerial people" were standing next to her and "seeing the same thing I am." (*Id.* 187:2-4.)

On September 28, 2007, Miedema was working at the Spectrum office in the early evening. (*Id.* 122:20-123:7.) The Spectrum office was a ranch-style home that was attached through a back door to the Spectrum warehouse, which contained the catering kitchen. (*Id.* 125:16-18, 127:14-15, 130:18.) Miedema realized that she had left her keys in the catering kitchen and so walked through the warehouse to the kitchen. (*Id.* 125:16-18.) As she walked through the warehouse, Miedema passed several warehouse employees, including Ventura, Ruben Garcia, William Ventura (another brother of Eduardo Ventura), and a few others. (*Id.* 125:18-126:4.) Miedema retrieved her keys and walked back through the warehouse towards the office. (*Id.* 126:22-25.) She passed Eduardo and William Ventura. (*Id.* 127:1-3.) William raised

5

his hand and said, "Adios." (*Id.* 127:4-5.) Miedema responded, "Adios," and kept walking to the office. (*Id.* 127:6.) Eduardo said, "What about me?" (*Id.* 127:10.) Miedema didn't say anything but raised her hand in acknowledgment. (*Id.* 127:11-12.) Miedema entered the house through the back door, locked it, shut the lights off in that room and the hallway. (*Id.* 127:15, 129:9.) She sat down at her desk, left a voicemail for a co-worker, and began writing an email. (*Id.* 129:18-21.) No one else was in the office. (*Id.* 130:12-15.)

As Miedema wrote the email, she sensed someone behind her. (*Id.* 130:8-9.) She turned around and saw Ventura standing at the door. (*Id.* 130:10-11.) She was shocked by his presence because usually she would have heard someone entering through the back door. (*Id.* 131:10-14.) Miedema asked him, "What are you doing here? I thought you left." (*Id.* 131:16-17.) Ventura responded, "I did, but I came back." (*Id.* 131:18.) Miedema continued typing as Ventura closed the blind by her desk. (*Id.* 131:19, 132:3-4.) Ventura began rubbing Miedema's shoulders, and Miedema said that she had a kink in her neck. (*Id.* 132:7-8, 15-18.) Miedema states that the shoulder rub was consensual. (*Id.* 134:16.)

Ventura moved from rubbing Miedema's shoulder to placing his hand down her shirt to touch her left breast. (*Id.* 134:23-25.) Miedema turned around in her chair, stood up, and said, "What are you doing?" (*Id.* 136:18-23.) Shocked by Ventura's sudden groping, Miedema believed that, if she continued doing her work, Ventura would stop his behavior. (*Id.* 137:18-21.) She went over to a counter in her office, organized items, and made phone calls to her family, as part of her attempt to make Ventura realize that she was doing her work. (*Id.* 137:9-11, 138:22-139:19.) Ventura grabbed Miedema's arm, pulled her into the restroom, and shut the door. (*Id.* 140:13-16, 141:1-3.) Ventura pushed Miedema against the sink and tried to remove her shorts. (*Id.* 141:20-142:2.) Miedema tried to push Ventura away, but did not yell or scream. (*Id.* 142:10-

16.) Ventura continued his exertions until they both heard a loud sound. (*Id.* 144:22.) Miedema ran out of the bathroom and into the hallway of the office to see if someone had come in the office. (*Id.* 145:2-12.) Miedema did not see anyone and returned to her office. (*Id.* 145:13-19.)

Miedema told Ventura, "There is nobody here, but you need to leave." (*Id.* 146:18-19.) She began gathering her things in an effort to leave the office quickly. (*Id.* 146:17-18, 147:24-25.) As she gathered her things, Ventura came towards her, put his hands on her breasts, and began to kiss her. (*Id.* 148:21-25.) Miedema again pushed him away, but Ventura pushed her towards a desk. (*Id.* 149:1-9.) Ventura pinned Miedema against the desk and unbuttoned her shorts as she attempted to push him away and pull his hands off of her. (*Id.* 149:22-150:10.) Miedema told Ventura to stop several times and that they weren't going to have sex as they had in the past. (*Id.* 152:12-17, 232:1-5.) Miedema told Ventura, "You need to leave." (*Id.* 230:21-25.) Ventura ignored Miedema and became even more forceful and aggressive. (*Id.* 152:19-20.) He pushed her back onto the desk and penetrated her. (*Id.* 153:5-6, 155:8-15.) Miedema managed to sit or stand up. (*Id.* 154:25.) She saw her husband at the door of her office. (*Id.* 155:4-5.) Miedema's husband cursed at Ventura and Miedema ran to the bathroom. (*Id.* 156:4-8.) When she came out of the bathroom later, Ventura had left. (*Id.* 156:10-13.) Miedema told her husband that the encounter with Ventura was not consensual. (*Id.* 159:8.) Miedema's husband called the police upon Miedema's request. (*Id.* 160:16-19.) Miedema gave the police a statement at the office and her husband contacted Parker to inform her of the situation. (*Id.* 161:11-13, 237:10-238:4.)

The next morning, Miedema was preparing to work at an event when Parker called her. (*Id.* 238:16-18.) Parker told Miedema not to go into work. (*Id.* 238:18-239:4.) Parker called Miedema again about half an hour later and told her that, after speaking with Spectrum's

7

lawyers, Spectrum was requesting that Miedema and Ventura not return to work on Monday. (*Id.* 239:6-7, 240:12-20.) Miedema did not report to work that day or on Monday. (*Id.* 240:10.)

After the September 28th incident, Spectrum sent Ventura a letter notifying him that he had been suspended pending a full investigation of Miedema's allegations. (Holmes Aff. Ex. A.) Ventura was also told that, if the allegations were substantiated, he would be terminated immediately. (*Id.*)

On October 15, 2007, Smalley wrote to Miedema. (Holmes Aff. Ex. B.) Smalley indicated that Miedema had failed to submit a statement regarding the incident as Spectrum had previously requested. Smalley also referenced a medical condition that Miedema was using as the reason why she had not returned to work. Smalley informed Miedema that, in order to request leave under the Family and Medical Leave Act ("FMLA"), she was required to submit the following documents by October 22nd: (1) an FMLA certification; (2) a doctor's written authorization to return to work; and (3) her account of the September 28th incident. (*Id.*)

Miedema's physician, Jeffrey Sweeney, issued a letter dated October 22nd stating that Miedema was under his care for Post Traumatic Stress Disorder ("PTSD") and was unable to return to work due to this condition. (Doc. No. 20 Ex. D.) On October 25th, Spectrum wrote to Miedema to acknowledge that it had received Dr. Sweeney's letter on October 23rd. Spectrum stated that it "considers this letter as sufficient information to conclude that Ms. Miedema is undergoing treatment for a medical condition and, therefore, has determined to count her leave as Family Medical Leave Act ('FMLA') leave." (Doc. No. 19 Ex. 4.) Spectrum also requested that Miedema ask her healthcare provider to complete a "Certification of Healthcare Provider promulgated by the U.S. Department of Labor" and return it within 15 days. (*Id.*)

When Spectrum did not receive the certification, it wrote to Miedema again on November 15, 2007. (Doc. No. 19 Ex. 5.) Spectrum stated that the "completed certification, and the information contained therein, was required in order to qualify Ms. Miedema's leave under the Family Medical Leave Act. As a result of her failure to provide that certification, and the fact that all of her paid time off has been used, her absence from work is unexplained and unexcused." (*Id.*) Spectrum terminated Miedema's employment. (*Id.*)

Miedema subsequently filed suit against Spectrum asserting claims of (1) negligence; (2) violation of the FMLA; (3) hostile work environment in violation of Title VII; and (4) retaliation in violation of Title VII.

## II.     SUMMARY JUDGMENT STANDARD

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir. 1997). If the movant meets this burden, then the nonmovant is required to go beyond its pleadings and designate, by competent summary judgment evidence, the specific facts showing that there is a genuine issue for trial. *Id.* The Court views all evidence

in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id*. Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### III.  ANALYSIS

Spectrum has moved for summary judgment on all of Miedema's claims. Miedema argues that there are genuine issues of material fact that preclude a grant of summary judgment regarding each of her claims.

#### A. Negligence

To succeed on a premises liability negligence claim, an invitee must prove that: (1) a condition of the premises created an unreasonable risk of harm to the invitee; (2) the owner knew or reasonably should have known of the condition; (3) the owner failed to exercise ordinary care to protect the invitee from danger; and (4) the owner's failure was a proximate cause of injury to the invitee. *Fort Brown Villas III Condo. Ass'n v. Gillenwater*, 285 S.W.3d 879, 883 (Tex. 2009).[1] An property owner's employees are considered invitees for the purposes of premises liability. *Hernandez v. Heldenfels*, 374 S.W.2d 196, 197 (Tex. 1963). The owner possesses a

---

[1] Texas distinguishes between a negligence claim based on liability for negligent activity and a negligence claim based on premises liability. *See Keetch v. Kroger Co.*, 845 S.W.2d 262 (Tex. 1992). "Recovery on a negligent activity theory requires that the person have been injured by or as a contemporaneous result of the activity itself rather than by a condition created by the activity." *Id.* at 264. Here Miedema has not alleged any negligent activity on the part of Spectrum that was contemporaneous with her September 28th assault. Rather, Miedema has alleged that Spectrum's prior failure to remedy a condition that posed an unreasonable risk of harm led to her assault. As such, Miedema's negligence claim is properly analyzed under a premises liability standard rather than a negligent activity standard. *See Timberwalk Apts. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998) (a raped woman's suit against her apartment building for failure to provide adequate security was properly analyzed as a premises liability claim).

duty of ordinary care to keep the premises in reasonably safe condition for invitees. *Carlisle v. J. Weingarten, Inc.*, 152 S.W.2d 1073, 1074 (Tex. 1941).

Miedema, as an employee of Spectrum, was an invitee on Spectrum's premises. The relevant conditions were the ongoing and unwanted sexual advances, whistling, touching, and grabbing of female employees by male employees. These conditions created an unreasonable risk of harm to female employees because they created an atmosphere in which female employees were more likely to be sexually assaulted or raped by their male coworkers.

However, Miedema's claim fails with respect to whether Spectrum knew or should have known of these conditions. Miedema unequivocally states that she never reported either the consensual sexual encounters with Ventura or his unwanted sexual advances to Spectrum management. She also states that she does not know of any complaints made by other Spectrum employees to Spectrum management about inappropriate contact or conduct by male employees. The evidence that Spectrum was aware of the dangerous conditions is Miedema's statement that Spectrum management employees were standing next to her when she saw this conduct. In addition, Miedema states that Parker was "well-aware" of the touching due to their conversations. This evidence, unfortunately, is insufficient to defeat a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.") Miedema does not detail exactly what Parker became "well-aware" of during their conversations, such as the type of conduct at issue (whether consensual or nonconsensual), the employees involved in the conduct, the location of the conduct, or other relevant factors. In addition, Miedema does not state with specificity the managerial employees who allegedly saw the touching in the warehouse, what

11

specific conduct they witnessed, whether the male employees who performed the touching remained employed at Spectrum, and specifically whether Spectrum managers ever witnessed Ventura engaged in inappropriate conduct.

In addition, Miedema proffers no genuine issues of material fact with respect to whether Spectrum failed to take measures to redress the sexually charged work environment. She fails to submit facts showing that Spectrum did not investigate claims of assault, allowed male employees to continue work despite their inappropriate conduct, or other types of action showing that Spectrum did not take appropriate measures. Though Spectrum allowed Ventura to possess a key to the back door of the office, Miedema has not shown that this act was a breach of Spectrum's duty. Miedema acknowledges that she never told Spectrum of Ventura's sexual advances towards her. In addition, she has not proffered any facts establishing that Spectrum knew or would have reason to know of Ventura's inappropriate conduct towards female employees such that Spectrum breached its duty when it provided him with a key to the back door. Therefore, we grant summary judgment to Spectrum on the premises liability claim.

### B.  FMLA and Retaliation

The FMLA contains two distinction provisions. *See Nero v. Industrial Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999) (quoting *Bocalbos v. National W. Life Ins. Co.*, 162 F.3d 379, 383 (5th Cir. 1998)). The "first type of provision creates a series of entitlements or substantive rights." *Nero*, 167 F.3d at 927. The employer may not "interfere with, restrain, or deny the exercise of, or the attempt to exercise," any right under FMLA. 29 U.S.C. § 2615(a)(1). "The second type of provision is proscriptive, and protects employees from retaliation or discrimination for exercising their rights under the FMLA." *Nero*, 167 F.3d at 927.

### 1.  Entitlement Under FMLA to Leave

The FMLA provides that an employee shall be entitled to a total of 12 weeks leave within any 12-month period in certain situations, including when "a serious health condition [] makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). When the timing of the need for leave is not foreseeable, an employee must give her employer notice as soon as practicable under the facts and circumstances of the situation so that the employer can determine whether the FMLA may apply to the leave request. 29 C.F.R. §§ 825.303(a), (b). Depending on the situation, the employee's notice may include information about the condition that renders the employee unable to perform the functions of the job. *Id.* § 825.303(b). An employee has an obligation to respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying. *Id.*

For employees who request leave on the basis of their own serious health condition, an employer may require that the leave be supported by a certification issued by the employee's health care provider. 29 U.S.C. § 2613(a); 29 C.F.R. § 825.305(a). The certification for leave on the basis of a serious health condition will be considered sufficient if it states (1) the name, address, telephone number, and fax number of the health care provider and type of medical practice/specialization; (2) the date on which the serious health condition commenced; (3) the probable duration of the condition; (4) the appropriate medical facts within the knowledge of the health care provider of the condition; and (5) a statement that the employee is unable to perform the functions of the position of the employee." 29 U.S.C. §§ 2613(b)(1)-(4); 29 C.F.R. § 825.30(a). The Department of Labor has developed optional forms for use in obtaining medical certification from health care providers that meets the FMLA's certification requirements. 29 C.F.R. § 825.306(b). The certification must be submitted within 15 days of the employer's request, unless it is not practicable under the particular circumstances to do so despite the

13

employee's diligent, good faith efforts. 29 C.F.R. § 825.305(b). If the employee fails to provide a certification, the employer may deny the taking of FMLA leave. 29 C.F.R. § 825.305(d), 825.313(b). An employer may require that the eligible employee obtain subsequent recertifications on a reasonable basis. 29 U.S.C. § 2613(e). If an employee qualifies for FMLA leave, the employee "shall be entitled, on return from [a qualified] leave -- (A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1); *Nero*, 167 F.3d at 925.

On October 15, 2007, Smalley requested from Miedema an FMLA certification in line with the Spectrum's company policy. The Spectrum Employee Handbook outlined requirements for the content of medication certification that generally tracked the statutory requirements. In response, Miedema submitted a letter from her doctor, Jeffrey Sweeney, that contained all the information required in a medical certification according to Spectrum's Employee Handbook. After receiving Sweeney's letter, Spectrum notified Miedema that the letter was sufficient for the company to conclude that Miedema was undergoing treatment for a medical condition and that her leave qualified as FMLA leave. Spectrum again asked Miedema for a medical certification to be completed on a Department of Labor form and to be returned to Spectrum within 15 days.

It is not clear whether Spectrum considered its second request for a medical certification to be another attempt to obtain an initial medical certification or a request for a recertification. In other words, it is unclear whether Spectrum accepted Sweeney's letter as a medical certification. However, even if Spectrum accepted Sweeney's letter as a medical certification, it was within its rights to ask for a recertification of Miedema's medical condition. 29 U.S.C. § 2613(e). If Miedema never produced the recertification, her leave did not qualify as FMLA leave. 29 C.F.R.

§ 825.313(c). Here it is undisputed that Miedema never provided Spectrum with a completed copy of the medical certification it requested on October 25, 2007. As such, Miedema's leave was not FMLA leave and she was not entitled to the protections of the FMLA. *Mauder v. Metro. Transit Auth. of Harris County*, 446 F.3d 574, 582-583 (5th Cir. 2006) (holding that employee's failure to provide employer with requested certification was sufficient to upholding district court's grant of summary judgment on employee's FMLA claim); *Schimek v. MCI, Inc.*, No. 3:05-CV-0045-P, 2006 U.S. Dist. LEXIS 54747, *37 (N.D. Tex. Aug. 7, 2006) (failure to provide an appropriate medical certification is fatal to a claim under the FMLA); *Hurt v. Ecolab, Inc.*, No. 3:05-CV-1508-BD, 2006 U.S. Dist. LEXIS 32373, *4 (N.D. Tex. May 23, 2006) (same). We grant summary judgment to Spectrum on the FMLA claim.

2. **Retaliation Under FMLA**

The Fifth Circuit applies the *McDonnell-Douglas* framework to analyze retaliation claims under the FMLA. In order to make a *prima facie* showing of retaliation, a plaintiff must show: (1) she was protected under FMLA; (2) she suffered an adverse employment decision; and either (3a) that she was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because she took FMLA leave. *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 768 (5th Cir. 2001). "[A] plaintiff need not establish a violation of the substantive, prescriptive provisions of the FMLA to allege a violation of the proscriptive provisions." *Id.* at 768. Once an employee succeeds in making a prima facie case, the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the employment action. Id. After the employer has done so, the employee must show by a preponderance of the evidence that the employer's reason is a pretext for retaliation. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000).

It is clear that Miedema has met the second prong of her *prima facie* case because her termination qualifies as an adverse employment action. Miedema has also established that she engaged in statutorily-protected conduct when she requested FMLA leave, even though it was not ultimately granted. *See Mauder v. Metro. Transit Auth. of Harris County*, 446 F.3d 574, 583 (5th Cir. 2006); *Woodson v. Scott & White Mem. Hosp.*, 255 Fed. Appx. 17, 19 (5th Cir. 2007); *Williams v. Lyondell-Citgo Ref. Co.*, 247 Fed. Appx. 466, 470 (5th Cir. 2007). As for the third prong, Miedema has made an initial showing that her termination was caused by the protected activity through the temporal proximity of her request for FMLA leave and her termination. *Mauder*, 446 F.3d at 583.

However, Miedema has offered no summary judgment evidence that suggests her employer's legitimate, non-discriminatory reason for terminating her is pretext. Spectrum has identified Miedema's failure to provide the appropriate FMLA certification and her consequent absence from work without authorization as the legitimate, non-discriminatory reason for Miedema's termination. Miedema has failed to identify facts suggesting that these reasons are mere pretext. As such, Miedema's claim of retaliation under the FMLA must fail. Summary judgment is granted to Spectrum on Miedema's FMLA retaliation claim.

### C. Title VII Hostile Work Environment

To state a hostile work environment claim under Title VII, the plaintiff must show that: (1) the victim belongs to a protected group; (2) the victim was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; (4) the harassment affected a term, condition, or privilege of employment; and (5) the victim's employer knew or should have known of the harassment and failed to take prompt remedial action. *EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007). For harassment to be sufficiently severe or

pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive. *Harris v. Forklift Sys.*, 510 U.S. 17, 21-22 (1993). *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 393 (5th Cir. 2007). A single incident of harassment, if sufficiently severe, could give rise to a viable claim of discrimination and so too could a continuous pattern of much less severe harassment. *WC&M Enters.*, 496 F.3d at 400.

The relevant incidents to be analyzed as potential sexual harassment fall into a few categories. First, there are Miedema's consensual sexual encounters with Eduardo Ventura and Robert Soboloff. There is no indication that Miedema found these encounters to be subjectively offensive. As a result, Miedema has not raised a fact issue about these encounters being sufficiently severe or pervasive to alter the conditions of her employment.

Second, Miedema claims that Walter Ventura took her back to Parker's apartment one night after a work Christmas party and had sex with her while she was highly inebriated. Miedema did not report this incident to Spectrum management. Miedema did not think that Parker knew about the incident. Miedema has failed to proffer any evidence that raises a genuine fact issue regarding Spectrum's actual or constructive knowledge of the incident.

Third, there is Miedema's sexual assault by Eduardo Ventura on September 28, 2007. Miedema has not raised a genuine issue of material fact regarding Spectrum's failure to take prompt remedial action. Parker told Miedema that she was requesting both Miedema and Ventura to refrain from coming to work after the incident. Spectrum suspended Ventura pending an investigation of Miedema's allegations, and informed Ventura that he would be terminated if the allegations proved true. Spectrum contacted Miedema several times to obtain her statement about the incident, but Miedema's counsel never provided Spectrum with her statement.

17

Miedema has not raised a fact issue regarding Spectrum's response nor argued that it was belated or insufficiently remedial in nature.

Fourth and finally, Miedema and other female employees were objects of unwanted sexual attention and contact by male employees working at Spectrum on a daily basis. However, as we explained above in the context of Miedema's premises liability claim, Miedema has failed to come forward with sufficient evidence at the summary judgment stage to show that there is a genuine issue of fact with respect to Spectrum's actual or constructive knowledge of this conduct. Thus, we find that Miedema has not come forward with sufficient facts to show that there is a genuine issue of material fact with respect to her Title VII hostile work environment claim that would preclude summary judgment. Summary judgment is therefore granted to Spectrum on this claim.

### D.  Title VII Retaliation

The burden of proof in Title VII retaliation cases depends on the nature of plaintiff's evidence supporting the causation element. Where, as here, the plaintiff seeks to prove causation by circumstantial evidence, the burden-shifting of *McDonnell Douglas* applies. *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 191 (5th Cir. 2001). To survive summary judgment, the plaintiffs must make a *prima facie* showing: (1) that the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action. *Ackel v. Nat'l Communs., Inc.*, 339 F.3d 376, 385 (5th Cir. 2003). Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3(a). If plaintiff succeeds in the *prima facie* showing, the employer can rebut this inference by producing evidence of a legitimate, non-

18

retaliatory reason for the adverse action. *Ackel*, 339 F.3d at 191. Plaintiff may provide evidence that the legitimate, non-retaliatory reason is pretextual, thereby supporting an inference that the Title VII protected activity was the "but for" cause of the adverse employment action. *Id.* at 191-92.

Even assuming that Miedema has established a *prima facie* case of retaliation, she has failed to offer evidence that Spectrum's alleged legitimate, non-discriminatory reason for her termination is pretextual. Spectrum has identified Miedema's failure to provide the appropriate FMLA certification and her consequent absence from work without authorization as the legitimate, non-retaliatory reason. Miedema has not raised any fact issues or submitted any evidence that this reason was merely pretextual. As such, Miedema's claim of Title VII retaliation cannot survive summary judgment. Summary judgment is granted to Spectrum on Miedema's Title VII retaliation claim.

## VI. CONCLUSION

Defendant Spectrum's Motion for Summary Judgment (Doc. No. 12) is **GRANTED.** Plaintiff's claims are **DISMISSED.**

**IT IS SO ORDERED**.

**SIGNED** this 11th day of April, 2011.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE